Lyndon B. Steimel – 011733
**Law Office of Lyndon B. Steimel**
14614 N. Kierland Blvd., Suite N-135
Scottsdale, AZ 85254
(480) 367-1188
(480) 367-1174 fax
lyndon@steimellaw.com

Attorney for Creditor C.S. & J.H. Leede LLC

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF ARIZONA (PHOENIX)

| | |
|---|---|
| In re:<br><br>DEXTER DISTRIBUTING CORPORATION, et al.,<br><br>　　　　　　　Debtors.<br><br>This Filing Applies to Debtor:<br><br>　　NEW CASTLE MEGASTORE CORP. | Bankruptcy Case No. 2:03-bk-03546-RJH<br><br>Chapter 11 proceeding<br><br>Jointly Administered With:<br>　2:03-bk-03548-RJH<br>　2:03-bk-04695-RJH through<br>　2:03-bk-04710-RJH<br>　2:03-bk-05427-RJH<br>　2:03-bk-11513-RJH<br>　2:03-bk-11515-RJH<br>　2:03-bk-04238-RJH<br>　2:07-bk-01017-RJH<br>　2:07-bk-01018-RJH<br>　2:07-bk-01019-RJH<br>　2:08-bk-05785-RJH<br><br>DECLARATION OF JOHN T. MARGESON IN SUPPORT OF LEEDE'S 11 USC §503(A) & BR 3003 MOTION AND APPLICATION FOR APPROVAL AND PAYMENT OF ITS ADMINISTRATIVE EXPENSES CLAIM |

　　　　JOHN T. MARGESON, under penalty of perjury, declares and states as follows:

1.     My name is John T. Margeson.  I am a Vice President in Bank of America's U.S. Trust division, which is the bank's Private Wealth Management division (hereinafter "Bank of America").  I have personal knowledge of the matters stated herein, I am over the age of 18, and I am competent to testify.

2.     Among my responsibilities as a Vice President of Bank of America, I represent our clients in the operation, maintenance and control of their non-financial, real estate assets.  When those assets include commercial real estate, my responsibilities include negotiating the terms of leases with potential tenants, collecting rent, overseeing the day-to-day operation and maintenance of the properties and accounting for the income and expenses related to the property.  Bank of America can act simply as the agent of the owners in these situations, or we can serve as the trustee of a legal trust or an estate.

3.     The retail building located at 406 Evans Black Drive, Tukwila, Washington (the "Tukwila store") is one of the commercial properties for which we have been responsible.  I personally have represented the owners of the Tukwila store for more than ten years.

4.     In 2005, the Tukwila store was owned in part by Bank of America, N.A., as Trustee of the Carl Stockbridge Leede Trust.  As a result of various bequests, the Tukwila store was also owned by William Edward Leede, as Trustee of the William E. Leede Trust; by Dorothy Leede Hanson, as Trustee of the Dorothy Leede Hanson Trust; by Charles W. Doland; by Julie Doland Shryock; and by Virginia D. Sanders.  All of these entities are hereinafter referred to as the "Original Owners."

5.     In light of the advancing age and declining health of Dorothy Leede Hanson and William Edward Leede, the Original Owners decided to transfer all ownership interests in that store to one legal entity.  C.S. & J.H. Leede LLC ("Leede") was incorporated in 2005 for that purpose.  Based on my working relationship with him, I know that Charles W. Doland is Leede's Managing Member.

6.      Before the transfer of ownership interests was completed, first Dorothy Leede Hanson (the trustee of the Dorothy Leede Hanson Trust) and then William Edward Leede (the trustee of the William E. Leede Trust) died.  The deaths of these individuals prompted the completion of the transfer process, which was accomplished by September 24, 2007.  As a result of that transfer, Bank of America was no longer a technical owner of the Tukwila store.  Instead, we were appointed to act, and have acted, as the agent of Leede since that time.

7.      As explained below in my declaration, and by Mr. Doland and Ms. Wood in their declarations, the transfer of the ownership interests in the Tukwila store to Leede was completed after the guaranty and lease were signed by and with Castle and MIMAR.  For the sake of convenience, however, I will refer to the Lessor of the Tukwila store solely as "Leede," unless a different reference is helpful for clarity.

8.      In early 2006, while I was managing the Tukwila Store on behalf of Bank of America, N.A., as Trustee of the Carl Stockbridge Leede Trust, the Original Owners of the Tukwila store were approached through our leasing agent GVA Kidder Mathews by representatives of Castle Megastore Corporation ("Castle").  Castle indicated its interest in leasing the Tukwila store for use in its retail operations.  On behalf of the Original Owners I entered into lease negotiations with Castle's representatives, which representatives included Madelyn Loreen of Seattle broker CB Richard Ellis, Mark Franks, Brett Fredericks and Vern Schweigert.

9.      As a part of our negotiations, on April 18, 2006 Ms. Madelyn Loreen of CBRE Richard Ellis sent me an email with 5 pages of the Castle Megastore 2005 Statement of Operations.  A true and accurate copy of that email and its accompanying financial statement is attached hereto as Exhibit 1.  I then called Vern Schweigert for additional information.  I was told about Castle's then-existing 2003 Chapter 11 bankruptcy filing, and we discussed the series of financial statements that are a part of Exhibit 1, which were used to demonstrate Castle's ability to pay the rent that would be required under a lease of the Tukwila store.  My

handwritten notes from that meeting appear on the bottom of page 2 of Exhibit 1.  Mr. Schweigert described his own position as a restructuring officer with many years of experience in restructuring companies and winding them up when required.  The corporation was being restructured for the benefit of creditors.  He explained that the stock of the corporation was placed in trust and a new management team, including Mark Franks as CEO, was in place.  He explained that the old management would not return for at least ten years, if at all.  He said that the Castle Megastore Corporation's existing stores were generating a very strong cash flow which allowed the corporation to open new stores while it was being restructured.  He explained that opening new stores was very unusual in his experience for a corporation that was being restructured but he said that the strength of the underlying business made it desirable.  From the financial statements and the description of the Castle Corporation I concluded that they would be a viable tenant for the Leede property.

10.     Lease negotiations continued in the succeeding months between Castle and the Original Owners, who were represented by me and by our leasing agent, GVA Kidder Mathews. I in turn reported on those negotiations to Charles Doland.  Mr. Mark Franks was my primary contact at Castle during these negotiations, and Castle Megastore Corporation was the intended lessee.  (Attached hereto as Exhibit 2 is a true and accurate copy of an email from Madelyn Loreen dated July 13, 2006, which reflects my direct contacts with Mark Franks.)  I also had some discussions with Brett Fredericks.  Then, on October 3, 2006—just days before the lease was finalized—Madelyn Loreen contacted me to request that the tenant in the lease be changed to "MIMAR Industries, LLC., a wholly owned limited liability corporation of New Castle Megastore Corporation, an Arizona corporation," with New Castle providing a Guaranty of performance.  A true and accurate copy of Ms. Loreen's email is attached hereto as Exhibit 3.

11.     I explained what transpired to Mr. Doland in an email dated October 5, 2006, a true and accurate copy of which is attached hereto as Exhibit 4:

Chuck
Here is the final lease.  There are some changes to the name of the

Lessee.  Yesterday they gave me the name MIMAR Industries
LLC.  They then gave me Mimar Industries LLC a wholly owned
subsidiary on New Castle Megastore.  Now I had three names.
Mark Franks explained that New Castle Megastore is the main
entity although they refer to it as Castle Megastore Corp.  They
were very willing to sign a guarantee, so I changed the lease to
MIMAR and added the guarantee from New Castle Megastore
dba Castle Megastore Corporation.  That's why I wanted to speak
to you yesterday.
John

Some additional negotiations followed with Castle, including the true and accurate copy of an October 13, 2006 email received from Ms. Loreen and attached hereto as Exhibit 5.  However, we ultimately agreed to make this requested name change because, as I indicated in the my email to Mr. Doland, Castle was going to guaranty all of the financial obligations under the Tukwila store lease, and I had been presented with many of the post-2003 financial results of that corporation to prove Castle's financial capability to pay what was due.  *See, e.g.,* Exhibit 1.

12.     Once we made the requested name changes to the identity of the tenant, and added Castle as the guarantor, the lease between the Original Owners and MIMAR Industries LLC (the "Tukwila Store Lease") was signed on October 15, 2006.  Mr. Vern Schweigert signed on behalf of MIMAR.  The guaranty appears as the last page (marked page 10) of the lease, and it too is signed by Mr. Vern Schweigert, but this time as Chairman of the Board and Chief Restructuring Officer of New Castle Megastore Corporation, doing business as Castle Megastore Corporation.  A true and accurate copy of that lease and guaranty is attached hereto as Exhibit 6.  As can be seen on page 7 of the lease, I signed on behalf of the Carl Stockbridge Leede Trust.

13.     Castle then began to routinely and consistently meet all of the Tukwila Store Lease obligations through, for instance, the payment of rent.  A true and accurate copy of one example of a payment stub, dated May 1, 2007, in the amount of $15,956 from "Castle Corporation" to Bank of America Private Bank Real Estate is attached hereto as Exhibit 7.

14.     As previously mentioned, Bank of America's interest (as trustee) in the Tukwila store was assigned to Leede on September 24, 2007.  A true and accurate copy of that assignment, signed by me on behalf of the Bank of America, is attached hereto as Exhibit 8.

15.     My job duties took me out to the Tukwila store from time to time.  Based on my personal observations, Castle actually operated the store by selling or renting the goods it had on offer to the public, and by meeting the financial obligations of the tenant related to the operation of the Tukwila store.  In other words, despite the fact that MIMAR was legally the "tenant" under the lease, Castle was the one that benefited from the operation of the business at the Tukwila store.

16.     By comparison, I never saw evidence that MIMAR was a functioning business entity, outside of being a simple placeholder as tenant on the lease.  Indeed, I did not even receive correspondence or email on "MIMAR letterhead," or anything of that sort.  Instead, communications flowed back and forth between Seattle and Castle's office in Tempe, Arizona.

17.     Near the end of July 2009 or at the beginning of August 2009, Mr. Charles Doland got in touch with me to let me know that he was contacted by a commercial neighbor of the Tukwila store, who informed him that Castle had vacated those premises.

18.     As a result of Mr. Doland's call, I went to the Tukwila store and discovered that it had been vacated and that all of the store's goods were gone.  Neither Castle nor MIMAR had provided me or anyone else at Bank of America with any notice of the intention to abandon those premises.  Furthermore, we received no copies of any papers filed with the United States Bankruptcy Court, or any copies of any notices issued by the Court, regarding any Chapter 11 proceedings involving Castle.

19.     Because we had received no notice of any intention by Castle to reject the lease, to fail to pay the rent, or to vacate the premises, I directed Ms. Pat Wood to issue her letter of August 7, 2009, which is attached to her declaration as Exhibit 2.  While the abandonment of the store was obviously not a good sign, I believed that Castle's past performance gave us every

right to demand and expect future performance of the lease's financial obligations. Ms. Wood's letter of August 7, 2009, was a part of the exercise of those rights.

20.     Unfortunately, we received no response to this August 2009 request for payment, and this complete silence has continued ever since. As a result, over the months that followed we pieced together on our own that (a) Castle's bankruptcy matter was joined in a case referenced as "In re Dexter Distributing Corporation," (b) Castle had sought and obtained permission from this Court to abandon the Tukwila Store Lease, even though Castle provided us with no notice whatsoever of its intention to do so, (c), we had to begin looking for a replacement tenant *after* Castle had vacated the premises when, if proper notice had been provided, we could have begun that process months earlier, and (d), Castle's classification of Leede's administrative expenses as an unsecured-and-impaired claim was incorrect.

21.     As just mentioned, because Castle failed to provide us with the court-ordered notice, we began searching for a new tenant months later than we otherwise could have done, and while the store was vacant rather than occupied. We began that search by retaining a brokerage firm named The Andover Company, Inc., which is located in Tukwila, Washington. With The Andover Company's assistance, Leede recently re-let the Tukwila store to a tenant named WesTower Communications Inc. True and accurate copies of that lease and its one amendment, signed by Mr. Doland as the managing member of Leede, are attached to his declaration as Exhibits F and G. WesTower Communications Inc. is unrelated to and unaffiliated with Leede. The negotiations over the lease terms were conducted at arms' length and, in my opinion, accurately reflect the current market. The WesTower lease term commences on July 21, 2010 and ends on July 20, 2015. Thus, the term extends beyond the end of the June 30, 2013 termination of the Tukwila Store Lease. The Base Rent due under the WesTower lease is, however, substantially below that which Castle obligated itself to pay under the Tukwila Store Lease. In addition, the new lease requires Leede to pay for substantial tenant improvements.

22.     In summary, while Leede successfully mitigated its damages, there remains $635,800.70 due and owing under the Tukwila Store Lease.  The sums due and owing are summarized as follows:

| Year | Balance Due On Base Rent | Balance Due On Additional Rent/Expenses | Total |
|---|---|---|---|
| 2009 | $73,894.00 | $18,983.19 | $92,877.19 |
| 2010 | $145,495.00 | $210,402.51 | $355,897.51 |
| 2011 | $70,650.00 | $0.00 | $70,650.00 |
| 2012 | $75,468.00 | $0.00 | $75,468.00 |
| 2013 | $40,908.00 | $0.00 | $40,908.00 |
| Total | $406,415.00 | $229,385.70 | $635,800.70 |

Legal fees and costs are in addition to this amount and will need to be determined following the Court's ruling on this motion, when it will be possible to present a total amount for that element of damages.

23.     Exhibit 9 to my declaration is a multipage Excel exhibit that provides detail on Leede's damages as a result of the breach of the Tukwila Store Lease and guaranty by year from 2009 through 2013.  The first page of Exhibit 9 is a summary like the table in ¶22 above.   Each subsequent page of Exhibit 9 then provides more detailed information by individual year. Exhibit 9 is drawn from the accounting records maintained in the ordinary course of Bank of America's business and, as discussed later in this declaration, is supported by the underlying documents, i.e., by the lease with respect to the rent owed on a monthly basis or by a bill for, e.g., utility expenses.

24.     As will be seen on the first page of Exhibit 9, and on each subsequent page of Exhibit 9, the category of "Base Rent" refers strictly to the Base Rent owed under the Tukwila Store Lease.  (*Compare* Exhibit 6, p. 1 to each respective year appearing in Exhibit 9.)  My calculations in Exhibit 9 give Castle credit for all sums paid directly by it, and for all sums to be paid by the new tenant (WesTower) under its lease of the Tukwila store.  For example in

October 2010, if Castle had not breached its guaranty of the Tukwila Store Lease, Leede would have received $14,515 in Base Rent. Under the WesTower lease, Leede will receive $8,500 in Base Rent, for a net loss of $6,015. Once the payments received or to be received are netted out against the unpaid rent covering the period from July 2009 through June 2013, I calculate that Castle owes Leede $406,415 in Base Rent under the Tukwila Store Lease.

25.     The column of "Additional Rent/Expenses" on the first page of Exhibit 9 includes items of recurring expense—like real estate taxes—that Castle either would have reimbursed Leede for, or for which it would have paid directly. That category also includes items of extraordinary expense, like broker commissions and tenant improvements, that were incurred to re-let the premises to WesTower, and which were incurred solely because of Castle's breach of the lease and guaranty. Those expenses only occurred in 2009 and 2010.

26.     The Additional Rent/Expense column of Leede's loss relates to bills or costs that were paid by Leede at my direction out of the account maintained for Leede at Bank of America. Accordingly, we have individual bills, checks, or other transaction records that support each and every dollar of those $229,385.70 in expenses that are summarized on Exhibit 9. I am a records custodian for those supporting documents, and they are maintained in the ordinary course of our business. True and accurate copies of all pertinent documents supporting those expenses are attached to this declaration as follows:

| Exhibit | Month/Year |
|---------|------------|
| 10 | January 2009 |
| 11 | February 2009 |
| 12 | March 2009 |
| 13 | April 2009 |
| 14 | May 2009 |
| 15 | June 2009 |
| 16 | July 2009 |
| 17 | August 2009 |
| 18 | September 2009 |

| 19 | October 2009 |
|----|--------------|
| 20 | November 2009 |
| 21 | December 2009 |
| 22 | January 2010 |
| 23 | February 2010 |
| 24 | March 2010 |
| 25 | April 2010 |
| 26 | May 2010 |
| 27 | June 2010 |
| 28 | July 2010 |
| 29 | August 2010 |

27.     Exhibits 28 and 29 include some expenses and one credit (for an insurance premium) that were applied on a pro-rata basis to Castle's account because those expenses or that credit relate to the period covering July 1 to July 20, 2010, as well as the period after July 20, 2010, when the Tukwila premises were and will be occupied by WesTower.  For instance, the formula used to determine the pro-rata expense owed by Castle on a semi-annual expense is (20 days divided by the 184 days from July 1 to December 31) times the expense.

28.     I understand that under some specific legal circumstances—circumstances that Leede contends do not apply here—11 U.S.C. §502(b)(6) imposes a one-year revenue cap on a claim arising from a breached lease.  If that measure of damages were to apply here, I calculate that it would equal $16,711.03 per month, or $200,532.36 for a full one year period.

29.     The largest part of that figure is the Base Rent due under the lease, which was $13,196 a month during the first year, or $158,352.00 on an annualized basis.  (*See* Exhibit 6, p. 1.)  Since the Tukwila Store Lease is a triple-net lease, Castle was also responsible for paying all expenses related to the operation of the store.  The expenses in this case are broken down into two broad categories, consisting on the one hand of expenses paid directly by Leede (through Bank of America) and then reimbursed by Castle, and on the other hand, of utility expenses paid directly by Castle.

30.     The expenses first paid by Leede and then billed to Castle equaled $2,760 per month during the first year.  Thus, when added to Castle's monthly bill, Castle paid $15,956 per month for both Base Rent and (reimbursed) Expenses during the first year of the lease.  (*See* Exhibit 7.)

31.     To this, one then needs to calculate the value of the expenses paid directly by Castle during that first year of the lease to calculate the full sum that would be owed, *if* 11 U.S.C. §502(b)(6) applied.  To determine that figure, I contacted the City of Tukwila's Finance Department and requested the billing summary for their utility charges for the Tukwila store during 2006 and 2007.  A true and accurate copy of the billing records that I received from the City of Tukwila, plus my summary of the monthly charges, is attached hereto as Exhibit 30. When the expenses incurred during the first year of the lease are added together, they equal $2,506.29, or $250.63 per month on average.

32.     Puget Sound Energy, which provided gas and electricity to the premises, would not provide us with the information for the first year of the lease because the account was held under Castle's name.  Puget Sound Energy did, however, provide me with documentation for the period covering January through October 15, 2006.  True and accurate copies of those documents, along with my typed summary of those charges, are attached hereto as Exhibit 31.  I calculated the total charges for gas and electricity during that ten-month period to be $5,043.96, as is seen from my typed summary on the first page of that exhibit.  Dividing that amount by 10 results in an average estimated monthly expense of $504.40.  This amount should *underestimate* the actual amount paid by Castle, and thus the amount recoverable under 11 U.S.C. §502(b)(6), because the Tukwila store was unoccupied for a portion of that period.  In other words, there was no tenant to consume gas and electricity at the store.  Total "direct expenses" for gas and electricity from Puget Sound Energy and utilities from the City of Tukwila therefore equal $755.03 per month.

33.     The one-year cap on damages under 11 U.S.C. §502(b)(6), if applicable, would therefore equal:

| Monthly Base Rent Plus Reimbursed Expenses: | $15,956.00 |
|---|---|
| Monthly Expenses Paid Directly By Castle: | $755.03 |
| Total Monthly Revenue for the Tukwila Store During the First Lease Year: | $16,711.03 |
| One Year's Lost Revenue (12 times $16,711.03): | **$200,532.36** |

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.**

August 11, 2010
Date

Seattle, WA.
Place

JOHN T. MARGESON

503p.doc